STATE OF NEBRASKA, APPELLANT, V. JEFFERY L. CROM, APPELLEE.
383 N.W.2d 461

Filed March 21, 1986. No. 84-471.

Paul L. Douglas, Attorney General, Donald L. Knowles,

Douglas County Attorney, and J. Michael Tesar, Special Deputy County Attorney, for appellant.

Michael T. Levy of Levy & Lazer, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The municipal court of the city of Omaha convicted defendant, Jeffery L. Crom, of driving while under the influence of alcohol. On appeal the district court reversed the conviction on the ground that the evidence of Crom's intoxication had been obtained as the result of an unconstitutional seizure of his person. The State has appealed to this court; we affirm.

On August 15, 1983, four or five patrolmen and a sergeant assigned to the 11 p.m. to 7 a.m. shift of the Omaha Police Department's selective enforcement unit determined to set up a transitory checkpoint, at which every fourth vehicle reaching it would be stopped on the pretext of checking the operator's license and the vehicle registration. The actual purpose of the stops, however, was to determine whether the operator of the vehicle emitted an odor of alcohol, in which event further investigation would follow.

All decisions relating to the establishment and operation of the checkpoint were made entirely by these field officers, who were not acting under any standards, guidelines, or procedures promulgated by the policymakers for the police department or other law enforcement agency. The officers were free to move the checkpoint from place to place and in fact established a number of such checkpoints at different locations throughout the city of Omaha at various times, as they alone saw fit.

The checkpoint in question was established at a little before 1 a.m. on August 16, 1983, by placing a marked police vehicle, with its rotating red lights flashing, in the center of the two southbound lanes of traffic near a southwest Omaha intersection, selected because of its proximity to a bar which had been the recent source of "numerous problems." The time was selected because of its near relationship to the bar's closing time.

Crom was driving one of the fourth cars to reach the checkpoint, and he was therefore stopped. There was no indication prior to the stop that Crom was driving under the influence of alcohol, that his motor vehicle was improperly registered, that he was operating the motor vehicle without a valid driver's license, or that he was violating any other law.

The officer making the stop detected the odor of alcohol on Crom's breath and gave Crom a field sobriety test. Crom failed that test and was transported to police headquarters, where a Breathalyzer test was administered. This test showed a blood alcohol level in excess of ten-hundredths of 1 percent, and Crom was charged with violating Neb. Rev. Stat. § 39-669.07 (Reissue 1984).

In *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), a police officer, notwithstanding that he had observed no traffic or equipment violation or other suspicious activity, stopped a motorist to check his driver's license and vehicle registration. As he was walking toward the stopped vehicle, the officer smelled marijuana and, the marijuana being in plain view, seized it.

Delaware argued the evidence of the marijuana's presence should not have been suppressed because officers should not be subject to any constraints in deciding which automobiles shall be stopped for license and registration checks. Delaware's contention was that its interest in discretionary spot checks as a means of ensuring the safety of its roadways outweighs the resulting intrusion on the privacy and security of the persons detained. The U.S. Supreme Court rejected Delaware's argument and affirmed the suppression of the evidence. In doing so the Court acknowledged that a state has a vital interest in the safety of its highways and therefore in determining what vehicles are being operated and by whom. The Court observed, however, that the fourth amendment to the U.S. Constitution imposes a standard of reasonableness upon the exercise of discretion by law enforcement agents in order to safeguard the privacy and security of individuals against arbitrary invasions.

The Court stated that the permissibility of a particular law enforcement practice is therefore judged by balancing its intrusion on the individual's fourth amendment interests

against its promotion of legitimate governmental interests. The reasonableness standard usually requires, at a minimum, that the facts upon which the intrusion is based be capable of measurement against an objective standard, whether this be probable cause or a less stringent test. Where the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the officer in the field.

The Court then reasoned that, given the alternative mechanisms available to accomplish Delaware's ends, the record did not warrant a conclusion that the incremental contribution to highway safety warranted the physical and psychological intrusion upon the occupants of the vehicles randomly stopped at the unbridled discretion of law enforcement officials. The Court therefore held that except in those situations in which there is at least an articulable and reasonable suspicion that a motorist is unlicensed, that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his or her documents is unreasonable under the fourth amendment to the U.S. Constitution. The Court said:

> When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

(Footnote and citations omitted.) 440 U.S. at 661.

Three months after its decision in *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), the U.S.

Supreme Court decided *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). Therein, two police officers stopped Brown, who was unknown to them, because he was walking in an area with a high incidence of drug traffic. The officers did not suspect Brown of any specific misconduct but wanted to ascertain his identity pursuant to a state statute requiring one lawfully stopped by an officer to identify himself or herself. In finding that Brown had been seized in violation of the fourth amendment to the U.S. Constitution, the Court again noted that determination of the reasonableness of a seizure involves a weighing of the gravity of the public concern served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. Citing *Delaware*, among other cases, the Court said at 51: "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."

The uncontradicted evidence in the case before us is that there was no plan formulated at the policymaking level of the Omaha Police Department, or elsewhere, which considered, weighed, and balanced the factors enumerated in *Delaware* and *Brown*. Rather, a six- or seven-person unit within the department, commanded by a field sergeant, was left free to decide when, where, and how to establish and operate the transitory checkpoint in question. The checkpoint was thus subject to the constitutional infirmity found to exist in both *Delaware* and *Brown*; that is, a driver's reasonable expectation of privacy was rendered subject to arbitrary invasion solely at the unfettered discretion of officers in the field.

As such, Crom was unreasonably seized in violation of the fourth amendment to the U.S. Constitution. The judgment of the district court reversing Crom's conviction was therefore correct and must be affirmed. That determination makes it unnecessary that we consider any other aspect of this case.

AFFIRMED.

KRIVOSHA, C.J., concurring.

I concur in the result reached in the per curiam opinion

adopted by the court. I write separately, however, because I believe that the per curiam, standing alone, may lead one to believe that the mere adoption of a plan formulated at the policymaking level of a law enforcement agency may be sufficient to permit the type of random stops conducted in the instant case. I believe there is more to this matter than merely the formulation of a plan.

An examination of the decisions throughout the United States, including those by the U.S. Supreme Court, indicates that there is much confusion and some facial inconsistency in the decisions regarding the constitutional validity of roadblocks. Some courts have concluded that it is not a violation of either the fourth or fourteenth amendments to the Constitution of the United States for police officers, state or federal, to stop a motor vehicle without reasonable cause or an articulable reason. See, *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983); *United States v. Croft*, 429 F.2d 884 (10th Cir. 1970); *United States v. Millar*, 543 F.2d 1280 (10th Cir. 1976); *United States v. Prichard*, 645 F.2d 854 (10th Cir. 1981); *State v. Smolen*, 232 A.2d 339 (Conn. Cir. 1967); *City of Miami v. Aronovitz*, 114 So. 2d 784 (Fla. 1950); *Sowers v. The State*, 146 Ga. App. 701, 247 S.E.2d 225 (1978); *People v. Estrada*, 68 Ill. App. 3d 272, 386 N.E.2d 128 (1979); *Morgan v. Town of Heidelberg*, 246 Miss. 481, 150 So. 2d 512 (1963); *State v. Coccomo*, 177 N.J. Super. 575, 427 A.2d 131 (1980); *State v. Shankle*, 58 Or. App. 134, 647 P.2d 959 (1982); *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983). Other courts, including the U.S. Supreme Court, have held to the contrary, declaring that, absent an articulable reason or the existence of reasonable cause, such stops violate the fourth amendment to the U.S. Constitution. See, *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S. Ct. 2535, 37 L. Ed. 2d 596 (1973); *State v. Severance*, 108 N.H. 404, 237 A.2d 683 (1968); *Koonce v. State*, 651 S.W.2d 46 (Tex. App. 1983); *State ex rel. Ekstrom v. Justice Ct. of State*, 663 P.2d 992 (Ariz. 1983); *State v. Olgaard*, 248 N.W.2d 392 (S.D. 1976); *People v. Glover*, 93 Cal. App. 3d 376, 155 Cal. Rptr. 592 (1979); *State v. Hilleshiem*, 291 N.W.2d 314 (Iowa 1980); *State v. Marchand*,

104 Wash. 2d 434, 706 P.2d 225 (1985). One may find a collection of most of these cases reported in Annot., 37 A.L.R.4th 10 (1985). See, also, Gardner, *Searches and Seizures Of Automobiles And Their Contents: Fourth Amendment Considerations In A Post-Ross World,* 62 Neb. L. Rev. 1 (1983).

The answer as to whether any roadblock can ever be constitutionally established lies within the fourth amendment to the U.S. Constitution. The amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In each case the question to be addressed is whether the search or the seizure is "unreasonable."

It has long been held, and is considered to be well settled, that "under the Fourth and Fourteenth Amendments . . . a search conducted without a warrant issued upon probable cause is *'per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). One of those exceptions is what is frequently referred to as "the automobile exception." See, *Cady v. Dombrowski,* 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973); *South Dakota v. Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). The reason for this exception appears to be twofold. The courts have indicated that because of the mobility of the automobile, less stringent requirement should be imposed upon police officers seeking to search or seize an automobile. Courts have further indicated that persons are inclined to expect less privacy in an automobile than they would in their homes and therefore are not required to be given the same kinds of protection that the fourth amendment affords to persons in their homes. See *Chambers v. Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), *reh'g denied* 400 U.S. 856, 91 S. Ct. 23, 27 L. Ed. 2d 94.

It is clear, however, that the mere fact that an automobile is

involved does not eliminate the guarantees provided by the fourth amendment nor make every search or seizure of an automobile reasonable. *United States v. Ross,* 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). As noted by the U.S. Supreme Court in *Delaware v. Prouse,* 440 U.S. 648, 662-63, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979):

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra* [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

Moreover, the rules applicable to searches apply equally to seizures, both growing out of the prohibition contained within the fourth amendment. That stopping an automobile is a seizure and therefore must be reasonable under the facts of the case is without question. As noted by the U.S. Supreme Court in *Delaware v. Prouse, supra* at 653-55:

> The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief. *United States v. Martinez-Fuerte,* 428 U.S. 543, 556-558 (1976); *United States v. Brignoni-Ponce,* 422

U.S. 873, 878 (1975); cf. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents, in order " 'to safeguard the privacy and security of individuals against arbitrary invasions. . . .' " *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978), quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967). Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field," [citations omitted].

Therefore, the fact that one is in an automobile and does not have as great an expectation of privacy as one might have in the confines of his or her home does not totally eliminate the restrictions imposed upon the government under the fourth amendment.

While it is argued in this case, as in all other similar cases, that such stops are in the interest of traffic safety and therefore the government has an important interest, that factor alone is not sufficient. The interest of the members of the driving public, who are not violating the law, to be free of unreasonable seizures must also be a part of the balancing formula.

As the U.S. Supreme Court noted:

The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other

intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ."

(Citation omitted.) *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).

The mere fact that a citizen is out of his home and on the public street does not deprive that citizen of all of his fourth amendment rights. As observed by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the fourth amendment right of privacy belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs.

Whether a search and seizure is unreasonable within the meaning of the fourth amendment may depend upon the facts and circumstances of each case. See *Cooper v. California*, 386 U.S. 58, 87 S. Ct. 788, 17 L. Ed. 2d 730 (1967), *reh'g denied* 386 U.S. 988, 87 S. Ct. 1283, 18 L. Ed. 2d 243. There is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Camara v. Municipal Court*, 387 U.S. 523, 536-37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967).

In *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), the U.S. Supreme Court discussed in some detail how the balancing of the state's needs, on the one hand, and the public right to privacy, on the other hand, should be balanced. In *Brown* the police attempted to stop an individual and obtain identification solely on the basis that he had walked away from another individual in an alley. In declaring such action inappropriate the U.S. Supreme Court said at 50-51:

" '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,' *id.*, at 16, and the Fourth Amendment requires that the seizure be 'reasonable.' " *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

The reasonableness of seizures that are less intrusive than a traditional arrest, see *Dunaway v. New York*, 442 U.S. 200, 209-210 (1979); *Terry v. Ohio*, 392 U.S. 1, 20 (1968), depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977); *United States v. Brignoni-Ponce, supra*, at 878. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. See, *e.g.*, 422 U.S., at 878-883.

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. See *Delaware v. Prouse*, 440 U.S. 648, 654-655 (1979); *United States v. Brignoni-Ponce, supra*, at 882. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. *Delaware v. Prouse, supra*, at 663. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 558-562 (1976).

The only exceptions to the general rule, absent exigent circumstances, appear to be those few cases involving individuals coming into this country at or near our borders and passing through *permanent* checkpoints. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976). The U.S. Supreme Court, in approving the action taken by the government in *Martinez-Fuerte, supra*, carefully pointed out that each defendant was arrested at a *permanent* checkpoint operated by the Border Patrol. In upholding the validity of such stops at permanent checkpoints because of the government's overriding interest in maintaining national

security, the U.S. Supreme Court said at 558:

> "[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." [Citation omitted.]

The Court went on to further note at 559:

> Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.

While the U.S. Supreme Court has held that stops for brief questioning routinely conducted at *permanent* checkpoints near our borders are consistent with the fourth amendment and need not be authorized by warrant, it has consistently

emphasized that the stop must be at a *permanent* location having all of the characteristics of a permanent location located near our borders. In *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S. Ct. 2535, 37 L. Ed. 2d 596 (1973), the U.S. Supreme Court struck down the practice of the Border Patrol's randomly searching automobiles more than 25 air miles north of the Mexican border, notwithstanding the fact that 8 U.S.C. § 1357(a)(3) (1970) of the Immigration and Nationality Act provided for warrantless searches of automobiles and other conveyances "within a reasonable distance from any external boundary of the United States," as authorized by regulations to be promulgated by the Attorney General. The Attorney General's regulations had defined "reasonable distance" as "within 100 air miles from any external boundary of the United States." In declaring such action in violation of the fourth amendment, the U.S. Supreme Court in *Almeida-Sanchez, supra* at 269, said: "Automobile or no automobile, there must be probable cause for the search."

The basis for this view as to what is reasonable and what is unreasonable under the fourth amendment to the U.S. Constitution is not new. It had its inception more than 50 years ago in the case of *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). In that case Carroll had been convicted of transporting 68 bottles of bonded whiskey and gin in violation of the National Prohibition Act, a matter which was of as much concern to the government in 1925 as drunk drivers are to the government in 1985. In holding that the government could not stop and search an automobile absent some articulable reason or reasonable cause, Chief Justice Taft said for the Court at 153-54:

> It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.

> But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

This notion was repeated some 50 years later in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), when the U.S. Supreme Court said:

> Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

The majority in *Delaware v. Prouse, supra,* did, by way of dictum, attempt to modify its holding by saying at 663:

> This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of *all* oncoming traffic at roadblock-type stops is one possible alternative.

(Emphasis supplied.) Whatever may have been the purpose of that dictum, it did not change the results in *Delaware v. Prouse, supra*, nor does it change the requirements of the fourth amendment.

When one examines the U.S. Constitution in light of the manner in which it has been interpreted over the years in cases of this nature, including *Delaware v. Prouse, supra*, one must conclude that the offhand suggestion by Justice White that roadblock-type stops at less than permanent facilities (if that is what Justice White meant, and it is not clear) of all cars would satisfy the requirements of the fourth amendment, absent evidence of probable cause or exigent circumstances, does not seem to stand the balancing test required by the fourth amendment and appears to be inconsistent with the holding of

the case itself. See *State v. Marchand,* 104 Wash. 2d 434, 706 P.2d 225 (1985).

Even those state courts which have approved such stops have imposed strict requirements on the police in an effort to effect what they perceive to be a reasonable balance between the rights of the citizen and the needs of the government.

The Iowa Supreme Court in 1980 set out what is believed to be a minimum requirement to pass constitutional muster when, in the case of *State v. Hilleshiem*, 291 N.W.2d 314, 318 (Iowa 1980), it said:

> Where there is no consent, probable cause, or *Terry*-type reasonable and articulable suspicion, a vehicle stop may be made only where there minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to "show . . . the police power of the community;" and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria.

On that basis the Iowa Supreme Court, in the *Hilleshiem* case, declared a roadblock stop similar to that conducted in the instant case to be in violation of the fourth amendment to the U.S. Constitution and sustained the defendant's motions to suppress the evidence obtained as a result of the roadblock.

One is inclined to believe, however, that when requirements such as those suggested in *Hilleshiem* are imposed, the end result is not very likely to produce many, if any, drunk drivers. Therefore, balancing the right of privacy of the citizen against the interests of the government in apprehending drunk drivers, one might conclude that no *temporary* roadblock created to apprehend drunk drivers is ever permissible.

In reaching that conclusion we are fully cognizant of the serious problems that drunk drivers pose to the public. We must, however, address that problem squarely and honestly,

and not by ignoring the requirements of the Constitution. According to what little evidence is available, the roadblock in the instant case did little to aid the police in apprehending drunk drivers. Although the police conducted biweekly roadblocks for 50 weeks preceding the roadblock in question, no evidence was produced which established that a single driver was arrested for drunk driving prior to the evening in question. On the basis of that record it is difficult to find that the interests of the state outweigh the fourth amendment right of the citizen.

While we recognize that a drunk driver behind the wheel of an automobile poses a serious threat to society, we should not ignore the provisions of either the fourth amendment or the declarations of the U.S. Supreme Court in such matters. If the police may stop citizens at random on the pretext of checking identification, what is to stop the police from halting persons in a parking lot as they approach their automobiles? And if such a seizure is permitted, what is left of the fourth amendment?

The issue presented in cases of this nature is not whether persons who violate the law by operating a motor vehicle under the influence of intoxicants should be permitted to go free. To be sure, they should not. The question is whether citizens may be stopped at 1 a.m. to display their operators' licenses and automobile registrations, absent any articulable reason or reasonable suspicion that they have violated the law. While we are aware of the problems which drunk drivers pose to all citizens, we are further aware of the hazards which may be imposed upon the public if the fourth amendment to the Constitution of the United States is not adequately enforced. Justice Jackson, soon after his return from the Nuremberg trials, wrote:

"These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." [Citation omitted.]

*Almeida-Sanchez v. United States*, 413 U.S. 266, 274, 93 S. Ct.

2535, 37 L. Ed. 2d 596 (1973).

And in *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 29 L. Ed. 746 (1886), the U.S. Supreme Court, 100 years ago, said:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

It may very well be that no set of rules which permits transitory roadblocks of the type here can ever satisfy the requirements of the fourth amendment.

BOSLAUGH and HASTINGS, JJ., concurring.

We concur in the judgment of the court. The particular roadblock in this case appears to have violated a generally accepted rule that roadblocks should be established by carefully circumscribed, objective regulations established by high-level administrative officials. *Little v. State*, 300 Md. 485, 479 A.2d 903 (1984); *State v. Hilleshiem*, 291 N.W.2d 314 (Iowa 1980).

Although such a rule has merit, it is not, as suggested, supported by the language in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), preventing the stopping of automobiles "at the unbridled discretion of police officers." It is important to recognize that *Prouse* went no further than to declare that traffic stops made in a random manner at the "unbridled discretion of police officers" violate the fourth amendment to the Constitution of the United States.

Prior to the decision in *Delaware v. Prouse, supra*, it had been the law in this state, both by statute and by the decisions of this court, that a peace officer could stop any motor vehicle at

any time and require the operator to exhibit his or her operator's license and the registration for the vehicle. Neb. Rev. Stat. § 60-435 (Reissue 1978); *State v. Kretchmar,* 201 Neb. 308, 267 N.W.2d 740 (1978); *State v. Holmberg,* 194 Neb. 337, 231 N.W.2d 672 (1975); *State v. Shepardson,* 194 Neb. 673, 235 N.W.2d 218 (1975). Although there were conflicts in the cases from other jurisdictions, there was a large body of law which held that random stops for the purpose of enforcing licensing, registration, and safety laws were constitutional.

Although *Delaware v. Prouse, supra,* declared random stops unconstitutional, it made clear that under proper circumstances a roadblock-type stop may be used as a traffic law enforcement device. The opinion stated at 663:

> This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.

The opinion recognized the importance of spot checks as an enforcement tool and emphasized that it is the "unconstrained exercise of discretion" that makes a random stop unconstitutional. The opinion suggested that the "[q]uestioning of all oncoming traffic at roadblock-type stops" is an acceptable alternative. The concurring opinion suggested that stopping "every 10th car to pass a given point" would not be unconstitutional. 440 U.S. at 664.

This view is reinforced by the construction that the U.S. Supreme Court has placed on the *Prouse* case in its later decisions. In *United States v. Villamonte-Marquez,* 462 U.S. 579, 589, 103 S. Ct. 2573, 77 L. Ed. 2d 22 (1983), the Court referred to "the preference for roadblocks as opposed to random spot checks expressed in *Delaware v. Prouse* . . . ." Later in the same opinion the Court stated at 592-93: "Random stops without any articulable suspicion of vehicles away from the border are not permissible under the Fourth Amendment,

*United States v. Brignoni-Ponce, supra; Delaware v. Prouse,* 440 U.S. 648 (1979), but stops at fixed checkpoints or at roadblocks are."

In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975), decided prior to *Delaware v. Prouse, supra,* the Court noted that Border Patrol agents have no part in enforcing laws that regulate highway use. The Court then stated at 883 n.8: "Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters."

In *Texas v. Brown,* 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983), the defendant had been stopped at a "routine driver's license checkpoint." *Id.* at 733. When the police officer who had stopped the defendant asked the defendant for his license, the officer saw a balloon which contained narcotics fall from the defendant's hand. The U.S. Supreme Court held that the seizure of the balloon was constitutional, since it was in "plain view" and there was no issue concerning the validity of the officer's initial stop of the vehicle.

In *Texas v. Brown, supra,* the Court noted that a generalized expectation that some of the automobiles halted at the roadblock, which was located in a "'medium' area of narcotics traffic," would contain narcotics or paraphernalia did not make the seizure of the narcotics discovered in "plain view" in the defendant's vehicle unconstitutional. *Id.* at 743-44.

The annotation at 37 A.L.R.4th 10 (1985) discusses a number of the cases which have considered the validity of roadblocks to discover vehicular or driving violations. The author notes that such cases have generally held roadblock stops to be reasonable and lawful.

In *Little v. State,* 300 Md. 485, 501, 479 A.2d 903, 911 (1984), the Maryland Court of Appeals observed:

A majority of courts, however, have sustained the use of roadblocks as a proper law enforcement tool. As a general rule, the constitutionality of traffic checkpoints has been upheld where: (1) the discretion of the officers in the field is carefully circumscribed by clear objective regulations established by high level administrative

officials; (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) the likelihood of apprehension, fear or surprise is reduced by a display of legitimate police authority at the roadblock; and (4) *vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons.*

(Emphasis supplied.)

In *People v. Scott,* 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984), the New York Court of Appeals noted that individualized suspicion is not a prerequisite to a constitutional seizure of an automobile which is " 'carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers' . . . ." *Id.* at 525, 473 N.E.2d at 3, 483 N.Y.S.2d at 651. The roadblock involved in that case had been established pursuant to a memorandum of the county sheriff. The procedures established in the memorandum avoided discrimination by providing for the stopping of all vehicles "or every second, third or fourth vehicle . . . ." *Id.* at 523, 473 N.E.2d at 2, 483 N.Y.S.2d at 650. The court stated:

The fact that the plan contemplated situations in which not every car would be stopped did not affect its validity in view of the specific nondiscriminatory pattern of selection it called for [citations omitted] and of the reasonableness of allowing some cars to pass when traffic became congested [citations omitted].

*Id.* at 526, 473 N.E.2d at 4, 483 N.Y.S.2d at 652.

The correct rule appears to be that roadblocks are a permitted method of enforcement for laws pertaining to the licensing, registration, and operation of motor vehicles so long as vehicles are not stopped pursuant to the "unbridled discretion" of officers in the field. It is random stops, not "roadblock-type stops," that are unconstitutional.

The suspension or revocation of an operator's license cannot be an effective deterrent unless there is some practical method by which those driving without a license can be identified and apprehended. A roadblock or checkpoint may well be the only effective method to enforce this sanction.

This case involves much more than the stopping of an

intoxicated driver. At issue here is the method by which the State may enforce not only its vehicle licensing, registration, and traffic laws but also vehicle weight laws, fish and game laws, and other similarly licensed and regulated activities.

We subscribe to the following statements of Judge Nolan in his dissenting opinion to *Commonwealth v. McGeoghegan,* 389 Mass. 137, 145, 449 N.E.2d 349, 354 (1983):

> If illegal alien traffic and smuggling are sufficiently serious public problems to justify the Border Patrol in stopping vehicles for brief questioning of their occupants at a specific checkpoint despite the absence of articulable facts to justify the stopping of a motor vehicle (see *United States v. Martinez-Fuerte,* 428 U.S. 543, [96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976)], the "carnage caused by drunk drivers" (*South Dakota v. Neville,* 459 U.S. 553, 558, [103 S. Ct. 916, 74 L. Ed. 2d 748 (1983)] is even more serious and widespread.
>
> . . . .
>
> On balance, the inoffensive intrusion of a systematic stopping of all vehicles at a fixed point is a small price to pay for efforts to reduce the frightening slaughter on our highways caused by driving under the influence of liquor.