STATE OF NEBRASKA, APPELLEE, V.
ANTON H. KONCABA, APPELLANT.
674 N.W.2d 485

Filed February 10, 2004.   No. A-03-247.

Bell Island, of Island, Huff & Nichols, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Mark D. Raffety for appellee.

SIEVERS, INBODY, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Anton H. Koncaba was convicted of driving under the influence, second offense, in the county court for Scotts Bluff County, Nebraska, and sentenced to serve 90 days in jail. Koncaba appealed, and the Scotts Bluff County District Court affirmed. On further appeal to this court, Koncaba alleges that his conviction should have been reversed because evidence of his intoxication had been obtained as a result of an illegal search and seizure in connection with a vehicle check stop conducted by the Nebraska State Patrol. For the reasons set forth herein, we affirm.

## BACKGROUND

On September 7, 2001, the State Patrol conducted a vehicle check stop on Scotts Bluff County Road 34 located north of McGrew, Nebraska, in Scotts Bluff County. The check stop had been planned by Sgt. James Brady on August 18. The "Selective Enforcement / Vehicle Check Form" prepared by Brady set forth the troop area ("E") and sergeant area ("1") where the stop was to take place; the badge numbers of the officers who were to perform the stop ("283" and "300," identified by Brady as those of Troopers Jeff Wallace and Manuel Jimenez); the stop's date (Friday, September 7), start time (4 p.m.), end time (6 p.m.), and location ("N. McGrew"); the roadway type ("CR," identified by Brady as county road); and the stop's causative factor ("10-52," identified by Brady as a vehicle check). The form was initialed as approved by Brady on August 18. Brady testified that the purpose of the check stop was to check drivers for licensing and vehicles for registration and equipment violations. Brady testified that the check stop plan was implemented according to the guidelines set forth in a written policy of the State Patrol, which guidelines specify how vehicle check stops are to be conducted. According to Brady, troopers have a limited amount of discretion in following the guidelines.

On the day of the check stop, Wallace arrived at the check stop location shortly before 4 p.m.; however, Jimenez did not arrive until about 4:20 or 4:30 p.m., as he had misread his work schedule. Thereafter, the troopers immediately began to conduct the check stop by stopping all vehicles. Wallace worked the northbound traffic, and Jimenez worked the southbound traffic.

Koncaba was driving northbound on county Road 34 north of McGrew in a light-colored pickup truck when he approached the vehicle check stop. The record reflects that Koncaba passed Wallace's side of the check stop and that Wallace radioed Jimenez and told him that the light-colored pickup had passed him and that he had not checked it. Jimenez testified that he was standing in the middle of the road and had motioned with his hand for the pickup to stop, but that it continued to drive around him. Jimenez testified that he then turned around and yelled to Koncaba to stop, after which time Koncaba hit the brakes and stopped beside the road. Jimenez estimated that the pickup traveled between 5 and 15 feet before it stopped, and he testified that he had considered Koncaba's actions suspicious. Jimenez stated that he asked Koncaba (whom he had not yet identified) why he did not stop earlier and that Koncaba responded that he was not sure. Jimenez related that he proceeded to ask Koncaba for his driver's license, registration, and proof of insurance and then continued with a routine vehicle check that revealed no violations. Jimenez described Koncaba as having been calm, but testified that he had observed that Koncaba's eyes were a "little on the glossy side" and also had detected an odor of alcohol about Koncaba. Jimenez testified that he inquired of Koncaba whether he had been drinking and that Koncaba responded that he had just had supper at a local eating establishment, which Jimenez interpreted at the time to mean that Koncaba had been drinking. Jimenez stated that he then asked Koncaba to take a seat in his patrol car and noted that Koncaba was not stable and did not walk in a direct path to the patrol car. Jimenez further testified that after Koncaba got in the patrol car, Jimenez again detected an odor of alcohol, and that he inquired of Koncaba whether he would be willing to take field sobriety tests and a preliminary breath test. Koncaba subsequently complied with Jimenez' tests, failing the horizontal gaze nystagmus test, the one-legged stand test, the walk-and-turn test, and the preliminary

breath test. Jimenez then placed Koncaba under arrest, handcuffed him, and put him in the front seat of his patrol car.

Jimenez stated that while he was conducting his routine inspection of Koncaba's pickup according to the purpose of the check stop, no vehicles were in line waiting, but that after he started his investigation of whether Koncaba had been driving under the influence of alcohol or other drugs (DUI), he waved a few vehicles through the check stop. Jimenez testified that he informed Wallace that Koncaba had failed the sobriety tests and that he was going to transport Koncaba to jail. Jimenez indicated that Wallace then told him that he had a couple of vehicles stopped and that when he was done checking them, he was going to terminate the check stop to ensure officer safety. Jimenez left the check stop between 5:15 and 6 p.m. At the Scotts Bluff County jail, an "Intoxilyzer" test was administered and showed that Koncaba's breath alcohol level was in excess of the legal limit of eight-hundredths of 1 gram per 210 liters of breath.

On September 20, 2001, Koncaba was charged with driving under the influence of alcohol, third offense, pursuant to Neb. Rev. Stat. § 60-6,196(2)(c) (Supp. 2001), a Class W misdemeanor. On April 16, 2002, Koncaba filed a motion to suppress and alleged that his arrest was not based upon reasonable and articulable suspicion and therefore was a violation of his 4th and 14th Amendment rights under the U.S. Constitution and similar rights guaranteed by the Nebraska Constitution. Koncaba's motion was overruled by the Scotts Bluff County Court on June 11. The court found that the vehicle check stop was properly planned and set up, that Koncaba's failure to stop at Wallace's side of the check stop was a circumstance which warranted further investigation beyond the check stop routine, and that there was a sufficient amount of evidence to allow the arrest of Koncaba for DUI. Trial was held July 10, the charge was reduced to second offense, and Koncaba was found guilty and sentenced to 90 days in jail. Thereafter, Koncaba's conviction and sentence were affirmed by the Scotts Bluff County District Court. Koncaba timely filed this appeal.

## ASSIGNMENT OF ERROR

On appeal, Koncaba contends that the district court erred in failing to find that Koncaba's constitutional rights were violated

when the State Patrol failed to follow the established check stop plan.

## STANDARD OF REVIEW

■ Upon appeal from a county court in a criminal case, a district court acts as an intermediate appellate court, rather than as a trial court, and its review is limited to an examination of the county court record for error or abuse of discretion. Both a district court and a higher appellate court generally review appeals from a county court for error appearing on the record. *State v. Miller,* 11 Neb. App. 404, 651 N.W.2d 594 (2002); *State v. Cardona,* 10 Neb. App. 815, 639 N.W.2d 653 (2002).

■ In reviewing a trial court's ruling on a motion to suppress evidence, ultimate determinations of reasonable suspicion are reviewed de novo by an appellate court, while findings of historical fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Kelley,* 265 Neb. 563, 658 N.W.2d 279 (2003). See, also, *Ornelas v. United States,* 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *State v. Keup,* 265 Neb. 96, 655 N.W.2d 25 (2003); *State v. McCleery,* 251 Neb. 940, 560 N.W.2d 789 (1997).

## ANALYSIS

■ In Nebraska, freedom from unreasonable searches and seizures is guaranteed by U.S. Const. amend. IV and Neb. Const. art. I, § 7. *State v. Kelley, supra.* Evidence obtained as the fruit of an illegal search or seizure, in violation of the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, is inadmissible in a state prosecution and must be excluded. *State v. Kelley, supra.* Searches or seizures incident to check stops have been closely scrutinized.

In *State v. Crom,* 222 Neb. 273, 383 N.W.2d 461 (1986), the Nebraska Supreme Court affirmed the reversal of the driver's conviction for DUI on the ground that evidence of the driver's intoxication had been obtained as a result of an unconstitutional seizure of his person. In *Crom,* the Omaha Police Department set up a check stop at which every fourth vehicle was stopped on the pretext of checking the operator's license and the vehicle's registration. However, the purpose of the check stop was to determine whether the operator of the vehicle emitted an odor of alcohol, in

which event further investigation would follow. Further, there was no plan formulated at the policymaking level of the Omaha Police Department and the officers were free to decide when, where, and how to establish and operate the transitory check stop in question. The Nebraska Supreme Court held that a reasonable expectation of privacy was rendered subject to arbitrary invasions solely at the "unfettered discretion" of officers in the field and, as noted above, affirmed the district court's reversal of the driver's conviction. *Id.* at 277, 383 N.W.2d at 463. The Nebraska Supreme Court in *Crom* cited *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), wherein the U.S. Supreme Court held that except in those situations in which there is at least an articulable and reasonable suspicion that a motorist is unlicensed, that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his or her documents is unreasonable under the Fourth Amendment to the U.S. Constitution. Specifically, the *Crom* court said:

> "When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent."

222 Neb. at 276, 383 N.W.2d at 463.

The *Crom* court further cited *Brown v. Texas*, 443 U.S. 47, 50-51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), wherein the U.S. Supreme Court noted that "[c]onsideration of the constitutionality of [seizures less intrusive than a traditional arrest] involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."

Additionally, the *Crom* court stated, " 'A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.' " 222 Neb. at 277, 383 N.W.2d at 463.

The above cases illustrate that it is the "unfettered discretion" of the officers conducting check stops in the field and the lack of standards for the stop procedures that lead to an invalidation of the resulting search. It has also been recognized that the purpose behind the check stop is critical to a determination of its constitutionality. The U.S. Supreme Court in *Prouse* suggested that "[q]uestioning of all oncoming traffic at roadblock-type stops" would be a lawful means of serving the interest in highway safety. 440 U.S. at 663. Further, the Supreme Court has upheld brief, suspicionless seizures of motorists at sobriety check stops aimed at removing drunk drivers from the road. See *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990). See, also, *Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) (disapproving check stop program where primary purpose was to detect evidence of ordinary criminal wrongdoing and distinguishing permissible purposes related to patrol of borders or necessity of ensuring roadway safety).

The Nebraska Supreme Court again addressed check stops in *State v. One 1987 Toyota Pickup*, 233 Neb. 670, 447 N.W.2d 243 (1989), *overruled on other grounds, State v. Spotts*, 257 Neb. 44, 595 N.W.2d 259 (1999). The court therein found, as in *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986), that the driver had been unreasonably seized in violation of the Fourth Amendment to the U.S. Constitution as a result of a stop that was selectively conducted by troopers in the field without the State Patrol's high command being involved. Specifically, the date, time, location, and method of selecting motorists to stop were chosen by the troopers in the field, who conducted the stop without any prior approval given by supervisory personnel. Accordingly, the driver's reasonable expectation of privacy " 'was rendered subject to arbitrary invasion solely at the unfettered discretion of officers in the field.' " *State v. One 1987 Toyota Pickup*, 233 Neb.

at 676-77, 447 N.W.2d at 247-48, quoting *State v. Crom, supra.* The court noted that the State Patrol had promulgated a general operations manual for vehicle check stops, which manual bore language similar to that of the policy guidelines in the instant case and presumably was formulated to guide the patrol in the wake of *Delaware v. Prouse,* 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). The court noted that the manual apparently would meet the constitutional requirement of *Crom*; however, when the patrol disregards its own rules, the troopers in the field are effectively free to act with unconstrained discretion.

In the instant case, the State Patrol policy regarding vehicle check stops was introduced as evidence. The policy states that "vehicle check stops will be handled with the least intrusion possible and without an unconstrained exercise of discretion." The policy goes on to state:

> A. Vehicles can be stopped by officers solely for a check of license and registration and inspection of such vehicles only in the following manner and never on an individual random basis. Remember that this procedure applies only to vehicle checks and that there are other legitimate reasons for stopping vehicles. Vehicles may be stopped individually when an officer has a reasonable suspicion based on articulable facts that the vehicle or an occupant is committing a violation of law.
>
> 1. All vehicle check stops not based on articulable suspicion will be done within a vehicle check stop-type configuration. . . .
>
> .2. The initial decision to conduct a vehicle check stop must be made by a neutral source, such as a supervisor who is not involved in conducting the operation in the field.

Koncaba argues that the evidence against him should have been suppressed as the fruit of an illegal seizure because the State Patrol troopers did not strictly follow their check stop plan. Specifically, Koncaba argues that the troopers did not comply with the plan in connection with the location of the check stop, the time it was scheduled to be conducted, the number of officers required to conduct it, the manner in which the vehicles were stopped, and Jimenez' request that Koncaba get out of his pickup.

We initially note that Brady, a supervisor, made the decision to conduct the vehicle check stop at issue in this case and that he was not involved in conducting the operation in the field. Further discussion of the State Patrol vehicle check stop policy will be set forth below in connection with our analysis of Koncaba's specific arguments relating to his claim that the troopers deviated from the check stop plan and therefore exercised " 'unconstrained discretion,' " brief for appellant at 8, in conducting the stop.

*Location of Check Stop.*

Koncaba complains that Wallace and Jimenez were not given a specific location as to where to establish the check stop and that the "N. McGrew" location reference on the plan was insufficient. Brady testified that the check stop was planned for a location within his administrative area on a county road north of McGrew, which location, designated on the plan as "N. McGrew," Wallace and Jimenez were familiar with. Brady further stated that officers assigned to conduct check stops are not allowed to pick the location, with the exception that they are allowed to "minimally" move the location within the ordered area so that an effective and safe check stop can be conducted. Brady testified that Wallace and Jimenez conducted the check stop at the designated location.

Wallace and Jimenez both testified that they knew where the check stop was to be located based upon their knowledge of the north McGrew area, their knowledge of how the road was constructed in that particular area, and the location of two bridges, all of which factors they considered in setting up the check stop. Although Koncaba points out that Jimenez initially went to the wrong location, Jimenez testified that he mistakenly looked at the wrong date on his work schedule, which date directed him to another location, and that once he realized his mistake and talked to Wallace on his radio, he knew where to go. The evidence shows that Wallace and Jimenez conducted the stop at a location determined by a neutral source, i.e., Brady, their sergeant, and that the troopers did not exceed their limited discretion in determining where to set up the check stop in order to conduct a safe check stop.

*Time of Check Stop.*

Koncaba complains that the check stop was started late and was terminated prior to the designated time as set forth in the plan. The check stop was to occur from 4 to 6 p.m., which time was within the purview of the State Patrol policy guidelines specifying that check stops should be conducted in daylight hours and last a minimum of 1 hour. According to Brady and the policy, officers are not allowed to determine the duration of a check stop unless there is inclement weather or an emergency situation exists that would interrupt them or call them away.

The record reflects that Wallace arrived at the check stop location just before 4 p.m. on September 7, 2001, and set up check stop signs. Wallace stated that Jimenez was not there when he arrived and that he radioed Jimenez and found out that Jimenez had mistakenly gone to the wrong location, after which time Jimenez arrived at the check stop within approximately 20 to 30 minutes. Wallace stated that once Jimenez arrived, they proceeded with checking vehicles, and that the check stop lasted approximately 1 hour. Jimenez testified that he left the check stop location between 5:15 and 6 p.m. to transport Koncaba to jail and that Wallace had informed him that as soon as Wallace finished checking the vehicles Wallace had stopped, Wallace was going to close the check stop based on safety reasons.

Although Jimenez was late in arriving at the check stop and the check stop did not last for 2 hours as ordered by Brady, there is no dispute that Wallace and Jimenez were at the check stop for at least 1 hour, which is consistent with the State Patrol policy guidelines. In addition, because of the circumstances surrounding Koncaba's stop and his eventual arrest, it was necessary for the troopers to terminate the check stop prior to 6 p.m. This action was consistent with the State Patrol policy guideline specifying that the check stop procedures do not apply for stops based upon articulable suspicion of criminal activity, which is what Koncaba's stop became after the initial check stop.

*Sufficient Number of Officers.*

Koncaba next argues that the check stop plan was not complied with in that there were not two officers present during the entire time of the check stop. Koncaba argues that after Jimenez left to

transport Koncaba to jail, there was only one officer left to conduct the check stop. The State Patrol policy states that there must be a sufficient number of officers assigned to conduct the vehicle check stop to be able to stop traffic from all directions.

The record reflects that Brady assigned two troopers to conduct the check stop, which number was sufficient to stop the northbound and southbound traffic on the road north of McGrew. The record further reflects that once Jimenez notified Wallace that he was transporting Koncaba to the county jail, Wallace closed the check stop shortly thereafter. Thus, while Koncaba alleges that the troopers were exercising their own discretion in determining how many officers could conduct the check stop, the record clearly shows that Wallace's decision to close the check stop after Jimenez left was consistent with the State Patrol check stop policy in that he alone could not stop traffic from all directions.

*Manner of Stop.*

Koncaba also complains about the manner in which vehicles were stopped at the check stop. The State Patrol policy guidelines state, in relevant part, that all vehicles must be stopped and checked except when (1) traffic flow is extremely heavy, at which time vehicles may be slowed down to allow a cursory examination for valid license plates, or (2) stopped vehicles waiting in line reach a total of three per checking officer, at which time vehicles may be waved through until all stopped vehicles are checked and gone.

Jimenez testified that he stopped every vehicle traveling southbound on county Road 34 until Wallace radioed him and told him that a light-colored pickup truck had passed him and that he had not checked it. Jimenez indicated that after he stopped Koncaba's pickup for the routine check stop procedure, there was no traffic buildup, and that once he started his DUI investigation, he waved through fewer than five vehicles. Jimenez further stated that Wallace possibly stopped and checked some of the vehicles Jimenez had waved through, but that he was not certain that this had happened. Wallace testified that he also waved some vehicles through the check stop, and Wallace also conducted a DUI investigation during the check stop.

The record reflects that Wallace and Jimenez stopped and checked every vehicle until violations of the law were detected or reasonably suspected regarding a particular vehicle, which event required that the routine inspection procedure be discontinued in favor of further investigation. It was not until Jimenez suspected that Koncaba was operating his pickup under the influence of alcohol that he started waving vehicles through the check stop. Thus, the manner in which the troopers stopped the vehicles was not inconsistent with the State Patrol policy guidelines, as it was appropriate thereunder to wave vehicles through rather than allow a buildup of traffic while officers were conducting investigations of law violations. Further, there is no evidence that Koncaba was randomly selected to be stopped, which is a method of selection expressly disapproved in the guidelines.

*Request to Exit Vehicle.*

Koncaba asserts that Jimenez' request that Koncaba get out of his pickup exceeded the scope of the check stop. The State Patrol policy guidelines clearly state that at no time during a routine inspection will a driver be required to get out of his or her vehicle unless violations of the law are detected or reasonably suspected, in which case the procedure is no longer routine and the prohibition does not apply. While Koncaba argues that there was no evidence to raise a reasonable suspicion to support Jimenez' request that he get out of his pickup, the record suggests otherwise. Clearly, the fact that Koncaba drove past Wallace's side of the check stop without stopping, followed by Koncaba's deliberate disregard of Jimenez' hand motion to stop, coupled with Jimenez' detection of the odor of alcohol and observation of Koncaba's "glossy" eyes, were sufficient to raise a reasonable suspicion that Koncaba was committing a violation of the law. If an officer has a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to a traffic violation, the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation. *State v. Anderson,* 258 Neb. 627, 605 N.W.2d 124 (2000); *State v. Gutierrez,* 9 Neb. App. 325, 611 N.W.2d 853 (2000). Based upon the foregoing circumstances, we conclude that Jimenez had reasonable suspicion and was justified in requesting that

Koncaba exit his pickup for further investigation. At this juncture, the check stop procedure was no longer routine and the policy's routine check stop guidelines were inapplicable.

Taking all the above factors into consideration, we conclude that Koncaba's constitutional rights were not violated, because Wallace and Jimenez, the troopers who conducted the check stop, complied with the plan prepared by Brady, their supervisor, as well as the State Patrol policy guidelines concerning vehicle check stops. Further, there were articulable facts that triggered a reasonable suspicion that Koncaba was violating the law, thereby justifying the continued seizure. We conclude that the evidence of Koncaba's intoxication was not the fruit of an illegal seizure.

## CONCLUSION

We conclude that the district court did not err in affirming the trial court's determination that Koncaba's constitutional rights were not violated and in affirming Koncaba's conviction and sentence.

AFFIRMED.