STATE OF NEBRASKA, APPELLEE, V. PETER GUILBEAULT, APPELLANT.

336 N.W.2d 593

Filed July 22, 1983. No. 82-500.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and G. Roderic Anderson, for appellee.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

KRIVOSHA, C.J.

The appellant, Peter Guilbeault, was convicted in the District Court for Douglas County, Nebraska, of second degree murder in violation of Neb. Rev. Stat. § 28-304(1) (Reissue 1979). Following the trial to the court, a jury having been waived, the trial court ordered a presentence investigation and thereafter sentenced Guilbeault to imprisonment in the Nebraska Penal and Correctional Complex for a term of 30 years. Guilbeault now appeals to this court,

assigning but a single error. He maintains that a search of his apartment in Cohoes, New York, by parole officers at the purported request of the Omaha police resulted in his property being searched in violation of those rights guaranteed to him under the fourth amendment to the U.S. Constitution. He further maintains that by reason of this unlawful search any evidence obtained thereby, even though by means of a proper search warrant, must be considered to be the "fruits of a poisonous tree" and, in accordance with the rules announced by the U.S. Supreme Court in the case of *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), suppressed. The State, in part, argues that the initial search conducted by the New York parole officer, pursuant to a condition of Guilbeault's parole, is merely an extension of our earlier holding with regard to probation officers and therefore not in violation of the fourth amendment to the U.S. Constitution. See, *State v. Morgan*, 206 Neb. 818, 295 N.W.2d 285 (1980); *State v. Lingle*, 209 Neb. 492, 308 N.W.2d 531 (1981). We need not, however, reach that question in this case. By reason of our decision in *State v. Welsh*, *ante* p. 60, 332 N.W.2d 685 (1983), and in light of the affidavit filed for the purpose of obtaining a search warrant in this case, it is clear that the action taken in the instant case was not in violation of Guilbeault's fourth amendment rights. For that reason the conviction and sentence entered by the trial court must be affirmed.

The record reveals that the nude body of James Manning was found in the front yard of his home in Omaha, Nebraska, on October 1, 1981. Severe bruising was visible on Manning's neck and upper torso. An autopsy established the cause of death as asphyxiation associated with multiple injuries of the upper anterior chest, neck, chin, and left facial area. The pathologist noted that there was a band of contusions of the skin across the upper anterior chest,

neck, and shoulders "with an apparent zig zag pattern to the contused skin."

A police investigation uncovered the fact that between the hours of 11:30 p.m. on September 30, 1981, and 1 a.m. on October 1, 1981, Manning had been seen at two bars with the same man, later identified as Guilbeault. At approximately 1 a.m. on October 1, Manning and Guilbeault left the bar together after Manning purchased two six-packs of Pabst beer. This was the last time Manning was seen alive. Guilbeault was described as wearing a yellow T-shirt, blue jeans, and work boots. Evidence further disclosed that on September 30, 1981, Guilbeault was residing with his wife at the Salvation Army hostel in Omaha, Nebraska. Although Guilbeault's wife slept at the hostel that night, Guilbeault did not return to the hostel until 7:18 a.m. on October 1, 1981. At 1:15 p.m. on October 1, 1981, Guilbeault and his wife departed Omaha via a bus with the destination of Albany, New York.

When the police learned that Guilbeault was on parole from New York State, a Detective Nutsch contacted Douglas Smith, Guilbeault's New York parole officer, in an effort to locate Guilbeault. Detective Nutsch advised Smith that there had been a homicide in Omaha and that the Omaha police were interested in Guilbeault and wanted to know if he had arrived in New York. Nutsch learned from Smith that Smith had been notified on September 20, 1981, that Guilbeault was returning to New York and had been asked to conduct an investigation and employment check. Smith had unsuccessfully attempted to locate Guilbeault at a Cohoes, New York, address on September 27 and again on September 30. Smith left messages for Guilbeault to contact him immediately upon his arrival but Guilbeault had not yet done so. Smith volunteered to return to the Cohoes apartment, since Guilbeault had not checked in yet as instructed.

On October 5, 1981, Smith and another parole offi-

cer went to the apartment in Cohoes, New York, where they believed Guilbeault was living with his brother-in-law, Leon Galvin, and Galvin's wife. They found Guilbeault at home, wearing the combat boots in question. Pursuant to parole condition No. 4, which provided in part that Guilbeault would "permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property," Smith first made a cursory inspection of the apartment and found two shotguns. Upon closer inspection he found a yellow T-shirt similar to the one described by the Omaha police, but no evidence was seized by Smith at that time. Guilbeault was told to report to Smith the following day. Smith then relayed the information he had obtained to Detective Nutsch.

The next day, on October 6, 1981, Guilbeault met with Smith at the report station in Watervliet dressed in blue jeans and the same combat boots he had been wearing the previous day. In accordance with standard procedure he was photographed and fingerprinted at that time.

The following day, on October 7, 1981, Smith met with two members of the Omaha Police Department and a member of the Douglas County attorney's office. He contacted the chief assistant district attorney for Albany County and the state police unit. On October 8, 1981, a New York state policeman and Sergeant Goodrich of the Omaha Police Department submitted affidavits to the county court for Albany County, New York, seeking a search warrant for the residence and person of Peter Guilbeault. Sergeant Goodrich's affidavit alleged that Manning was in the company of a man positively identified as Guilbeault before his death; that Manning had purchased two six-packs of Pabst beer and left the bar with Guilbeault; that Manning was never seen alive after that time; that Guilbeault and his wife were residing at a Salvation Army hostel during the month of Septem-

ber 1981; that Guilbeault did not return to the hostel until approximately 7:18 a.m. on October 1, 1981, and was still wearing a yellow T-shirt and blue jeans that were soiled and stained and Army-type combat boots; that the pathologist concluded that the pattern injuries found on Manning's body were consistent with the victim having been kicked and stomped by an individual wearing boots of the type described as being worn by Guilbeault; that Manning's clothing, key chain, and wallet had not been recovered; that Douglas Smith, parole officer, had seen Guilbeault on two occasions wearing the combat boots and that they appeared to be of the same type as those used for comparison purposes by the pathologist; that a fingerprint on a Pabst beer can found at the murder scene was positively identified as belonging to Guilbeault; that boots of the type described as being worn by Guilbeault were obtained by officers working with Goodrich; that Goodrich caused the boots obtained and the pattern injuries on Manning to be compared and examined by members of the Omaha police division and Dr. Jerry Jones, a pathologist; and that as a result of that examination it was established that the markings were consistent with each other and that measurements were made, thereby demonstrating the pattern of the boots to be within 1 millimeter in length and separation of the marks on the body of James Manning.

Only one paragraph of Sergeant Goodrich's affidavit made any reference at all to Parole Officer Douglas Smith or any information given to him by Smith. The reference was to the effect that Smith told Goodrich that on October 5, 1981, and again on October 6, 1981, he saw Guilbeault wearing the described Army-type combat boots. No reference was made in the affidavit for the search warrant concerning anything seen or uncovered by Smith during either of his visits with Guilbeault other than his observing Guilbeault wearing boots of the type believed to be worn by the individual who killed Manning.

On the basis of that affidavit a search warrant was issued that morning directing the New York state police to search the residence and person of Peter Guilbeault for a wallet, key chain, and jacket belonging to Manning, a yellow T-shirt, blue jeans, and combat boots belonging to Guilbeault, and bus tickets from Omaha to Albany. That same morning, Smith delivered Guilbeault to the state police headquarters where he was questioned by Officer Miller of the Omaha Police Department. Guilbeault ultimately confessed to stripping and kicking Manning. After the officers questioned Guilbeault the search warrant was executed by the New York state police. Greyhound bus tickets indicating departure from Omaha and a destination of Albany, two pairs of blue jeans, and two brown garbage bags were seized at the apartment. The garbage bags, which were located on a landing outside the apartment, were found to contain personal papers belonging to the victim Manning. Also, a wallet and the combat boots were seized from Guilbeault at police headquarters after the interrogation was completed. Later that afternoon the police were notified that a warrant had been issued in Nebraska charging Guilbeault with second degree murder and a fugitive warrant was then issued for him in New York. Guilbeault waived extradition and was returned to Omaha to stand trial.

As we have earlier noted, we believe that our decision in *State v. Welsh, ante* p. 60, 332 N.W.2d 685 (1983), is dispositive of this appeal. In the *Welsh* case, as in this case, the defendant maintained that the police had obtained information in violation of his fourth amendment rights and, therefore, the warrant, which was otherwise proper, was tainted by reason of an illegal intrusion into a place where property belonging to Welsh was located. In affirming the action of the trial court in refusing to suppress the evidence obtained by the search warrant, we noted at 65-66, 332 N.W.2d at 688-89: ''An exami-

nation of the search warrant in this case discloses that even if the observations made by the officers are disregarded, there were more than ample independent facts contained in the affidavit which would have justified the court in granting a search warrant.''

Likewise, in the instant case, all the facts contained in the affidavit which are totally independent of any investigation made by Parole Officer Smith are more than sufficient to have justified the issuance of the search warrant. We noted in *Welsh* at 64-65, 332 N.W.2d at 688: ''While it is true that the U.S. Supreme Court decision in *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), not only requires the suppression of the illegally obtained evidence but the 'fruit of the poisonous tree' as well, not all evidence obtained is considered to be 'fruit of the poisonous tree,' and such evidence may be admitted if there is sufficient independent basis for the discovery of the evidence. In *Wong Sun* the U.S. Supreme Court specifically made that distinction when it observed that the constitutional question under the fourth amendment must be examined in light of whether the evidence to which objection is made has been come at by exploitation of the illegally obtained evidence or, instead, by means sufficiently distinguishable to be purged of the primary taint. . . . The application of the independent source rule in the context of a search warrant does not offend the underlying purpose and objectives of the exclusionary rule. See *United States v. Giordano*, 416 U.S. 505, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974). In a long line of cases both the U.S. Supreme Court and other federal courts called upon to examine this question have held that where an affidavit used for the purpose of obtaining a search warrant includes both illegally obtained facts as well as facts derived from independent and lawful sources, a valid search warrant may issue if the lawfully obtained facts, considered by themselves, establish

probable cause to issue the warrant. [Citations omitted.]"

As we have already noted, an examination of Sergeant Goodrich's affidavit was more than sufficient to justify the issuing of the warrant. With the exception of paragraph 14, all of the allegations contained in his affidavit were based upon the results of the Omaha Police Department's investigation of the homicide. Paragraph 14 did nothing more than set out that Officer Goodrich had been advised by Parole Officer Smith that Smith had, on two occasions, observed Guilbeault wearing boots of the type believed to be involved in the murder. As a matter of fact, the evidence clearly discloses that Guilbeault had no expectation of privacy with regard to the boots in view of the fact that he wore them publicly and they were in plain sight when taken from him by the police officers at the state police headquarters. *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). The affidavit filed by Goodrich was clearly sufficient and based upon independent sources; Guilbeault's contention that the warrant was the result of an illegal prior investigation of his property is simply without merit. In view of our disposition of this case, we need not reach any other questions presented by this appeal. The judgment of the trial court is affirmed.

AFFIRMED.