STATE OF NEBRASKA, APPELLEE, V. ERNIE W. CHAMBERS, APPELLANT.

444 N.W.2d 667

Filed August 25, 1989.   No. 88-341.

Ernie W. Chambers, pro se.

Robert M. Spire, Attorney General, and Kenneth W. Payne for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

After a bench trial in the county court for Lancaster County, Ernie W. Chambers was found guilty on the charge of operating a motor vehicle at the speed of 70 miles per hour in a 55-mile-per-hour zone and was fined $25, plus costs. Chambers appealed to the district court for Lancaster County, which affirmed the county court's decision; hence, Chambers' appeal to this court.

Trooper Robert Stivers of the Nebraska State Patrol, a pilot since 1975, was trained and certified by the State Patrol to use an aircraft for detection of vehicular speed. On September 11, 1986, Stivers was officially maintaining an aircraft patrol of Interstate 80 in Lancaster County, which had a speed limit of 55 miles per hour at the patrol site, when he observed a blue Honda automobile, later determined to be driven by Chambers, passing other cars on the Interstate. Stivers believed that the Honda was "running in excess of the speed limit." By using an "Accusplit 735XP" battery-powered stopwatch, Stivers timed Chambers' vehicle as the car traveled the State Patrol's predetermined course of 5,400 feet 7 inches between two 3- by 4-foot white rectangles painted on the shoulder of the Interstate. According to Stivers' stopwatch, Chambers' car traveled the measured course in 50.61 seconds. In view of the fractional or decimal figure for the time indicated on the stopwatch and consistent with State Patrol policy, Stivers rounded off the time for Chambers' vehicle at 51 seconds and consulted a "speed chart" to convert the determined time into miles per hour. Based on the chart used by Stivers, Chambers' car was traveling 70 miles per hour. Stivers then radioed Sgt. Robert Cruise, who was in his cruiser on the Interstate, and told Cruise that Chambers' Honda was traveling 70 miles per hour on the Interstate. From the aircraft, Stivers helped Cruise

identify Chambers' car and confirmed that Cruise had correctly identified and stopped the vehicle clocked at 70 miles per hour. Cruise testified that in his opinion formed during his observation of Chambers' moving vehicle, Chambers was "traveling in excess of the 55 mile-per-hour speed limit" shortly before Cruise signaled Chambers to pull to the Interstate's shoulder, where Cruise issued Chambers a citation for driving 70 miles per hour in a 55-mile-per-hour zone.

At trial, over Chambers' objection (foundation), only Stivers testified that Chambers was driving at 70 miles per hour. Stivers also testified that the Accusplit stopwatch used to clock Chambers' car was checked for accuracy by Fred Wilson Jewelers on August 18, 1986, and again on December 9, 1986. The State called Fred Wilson, a jeweler, who testified that he used a "Q.T. 10 Quartz Tester" to ascertain the accuracy of Stivers' stopwatch used to time Chambers' car. When asked on direct examination whether "other jewelers, to your knowledge, use a machine just like that [Q.T. 10 Quartz Tester] to check the accuracy of Quartz watches," Wilson responded, "Similar, I'm not sure though." Later, during direct examination of Wilson, when the State offered Wilson's "Stop Watch Certifications" for Stivers' watch, Chambers was allowed to interrogate Wilson, an interrogation which included:

[CHAMBERS:] And you also don't know whether this machine that you use [the quartz tester] is the one that jewelers in the trade use for the purpose that you stated?

[WILSON:] There's probably a dozen different companies that sell machines that do the same thing.

[CHAMBERS:] But you don't know and you've already testified to that, but I wanted — in response to my question to you, you don't know whether jewelers in the trade use this particular machine as the machine for testing these watches?

[WILSON:] No, I don't.

[CHAMBERS:] Mr. Wilson, when was the last time that your machine was tested to determine whether or not it was accurate?

[WILSON:] As far as I know, it never has been.

Asserting an insufficient evidential foundation, Chambers then objected to introduction of the certification documents. The court overruled Chambers' objection, received the certification documents, and, at the conclusion of evidence, found Chambers guilty of speeding, that is, operating a motor vehicle at 70 miles per hour in a 55-mile-per-hour zone.

Chambers assigns five errors, each of which questions the admissibility of evidence concerning the speed of Chambers' vehicle, which was determined by reference to Stivers' battery-powered stopwatch. Chambers' argument boils down to a contention that the State's evidence of his driving 70 miles per hour, determined by Stivers' timed observation, was inadmissible because the State failed to produce a foundation establishing the accuracy of Stivers' stopwatch.

"Admission or exclusion of evidence is a matter for the discretion of the trial court, whose ruling on an evidential question will be upheld unless such ruling constitutes an abuse of discretion." *State v. Olsan*, 231 Neb. 214, 220, 436 N.W.2d 128, 133 (1989).

Much of Chambers' brief revolves around the assertion that Stivers' stopwatch is an "electronic speed measurement" device within the purview of Neb. Rev. Stat. § 39-664 (Reissue 1988), which provides in part:

> (1) Determinations made regarding the speed of any motor vehicle based upon the visual observation of any law enforcement officer may be corroborated by the use of radio microwaves or other electronic device. The results of such radio microwave or other electronic speed measurement may be accepted as competent evidence of the speed of such motor vehicle in any court or legal proceeding when the speed of the vehicle is at issue. Before the state may offer in evidence the results of such radio microwave or other electronic speed measurement for the purpose of establishing the speed of any motor vehicle, the . state shall prove the following:
>
> (a) The measuring device was in proper working order at the time of conducting the measurement;
>
> (b) The measuring device was being operated in such a manner and under such conditions so as to allow a

minimum possibility of distortion or outside interference;

(c) The person operating such device and interpreting such measurement was qualified by training and experience to properly test and operate the device; and

(d) The operator conducted external tests of accuracy upon the measuring device, within a reasonable time both prior to and subsequent to an arrest being made, and the measuring device was found to be in proper working order.

In Chambers' previous appeal of a speeding conviction, *State v. Chambers,* 207 Neb. 611, 299 N.W.2d 780 (1980), we determined that § 39-664 was not applicable when the defendant's speed was "determined by use of a mechanical stopwatch." *Chambers, supra* at 614, 299 N.W.2d at 782.

We conclude that § 39-664 is equally inapplicable in the present case. Although the battery-operated stopwatch used by Stivers to time Chambers' car is properly characterized as an "electronic" device, Chambers' argument that the stopwatch is a "speed measurement" device ignores laws even more fundamental and universal than the laws of the State of Nebraska, namely, the laws of physics. Speed, or more correctly, velocity, is a function of distance and time. Time is one of the two elements in the formula v(elocity) = d(istance)/t(ime). A device which measures only one of the two elements utilized in the foregoing formula is not a "speed measurement device," but is either a device to measure time (more commonly known as a clock or watch) or a device to measure distance. Therefore, we conclude that a battery-operated stopwatch is not an "electronic speed measurement" device within the purview of § 39-664.

Acknowledgment of the laws of physics does not end our inquiry in Chambers' appeal. At trial, Chambers objected to introduction of Wilson's "Stop Watch Certifications," which purportedly verified the accuracy of Stivers' stopwatch used to time Chambers' car, and also objected to Stivers' testimony regarding the time registered by the stopwatch for the resultant calculation of Chambers' speed. We must, therefore, consider whether the State established a sufficient evidential foundation for admission of the stopwatch results as evidence that

Chambers' car was traveling 70 miles per hour.

In *State v. Chambers, supra,* we considered the use of a mechanical stopwatch in a speeding case, upheld the defendant's conviction, and stated:

> We believe the foundation evidence was sufficient to allow the State to establish the speed of the defendant's vehicle by use of the stopwatch. The evidence was that Lt. Donald Grieser, the officer flying the airplane, had been trained and certified for clocking ground vehicles from aircraft. The stopwatch had been tested on July 19, 1978, and again on August 25, 1978, and found to be accurate within 1 second per 24 hours or $6/10,000$ of a second per minute. Fred A. Wilson, the jeweler who performed the tests on the stopwatch, testified that the stopwatch had been tested on a Vibrograph machine which was an accepted method for determining the accuracy of watches. The Vibrograph machine was tested occasionally with another Vibrograph machine and other watches whose timekeeping accuracy was verified by a digital watch or an electronic clock.

*Id*. at 612-13, 299 N.W.2d at 781.

To sustain a conviction based on information derived from an electronic or mechanical measuring device, there must be "[r]easonable proof that the . . . machine was accurate and functioning properly." *State v. Kudlacek*, 229 Neb. 297, 301, 426 N.W.2d 289, 292 (1988) (foundation relating to accuracy of radar unit and Intoxilyzer machine). See, also, *State v. Snyder*, 184 Neb. 465, 168 N.W.2d 530 (1969). In *Snyder* and *Kudlacek*, we rejected the argument that for admissibility of information from a primary instrument, the accuracy of the primary instrument, such as a measuring device, must be established by an appropriate testing device which itself has been tested for accuracy, lest such evidence of testing and the testing itself "might have to proceed ad infinitum" to verify the accuracy of all instruments used. *State v. Snyder, supra* at 466, 168 N.W.2d at 531. See, also, *Peterson v. State*, 163 Neb. 669, 80 N.W.2d 688 (1957) (an officer's testimony that he drove his patrol car at 60 miles per hour, indicated by the car's speedometer, through the testing range for the radar device used to prove the speed of

the defendant's vehicle was sufficient foundation for admissibility of the radar-determined speed without proof of the speedometer's accuracy). Thus, although we have rejected a requirement that any testing device used to establish the accuracy of a primary measurement device must itself be independently tested, we have recognized such a procedure to thwart a foundational challenge to the primary device's accuracy. See *State v. Chambers*, 207 Neb. 611, 299 N.W.2d 780 (1980) (mechanical stopwatch tested with a Vibrograph, which was in turn itself tested against another Vibrograph).

Without some proof of reliability in the device used to test for accuracy in a primary device, a test for accuracy of the primary device is a meaningless exercise. Undoubtedly, a meaningless test for accuracy in Stivers' stopwatch does not supply the "reasonable proof of accuracy" required for the permissible introduction of evidence concerning information derived from the stopwatch. The test of the stopwatch in the present case somewhat resembles the situation in the apocryphal story of the cannon and the clock, recounted by our Chief Justice. The cannoneer was responsible for firing the cannon in the village square at 6 o'clock each day. When asked how he knew it was time to fire the cannon, the cannoneer answered that he simply looked at the clock in the tower of the village hall at the other end of the street which ran from the square to the hall. When the tower clock indicated 6 o'clock, he fired the cannon. However, when the clockkeeper was asked how he checked the tower clock's accuracy, he said that every time the village cannon fired, he looked up to verify the time, which was always 6 o'clock. In any event, we hold that to present "reasonable proof" that a stopwatch was operating correctly as an accurate device to measure time, the watch must be tested against a device whose instrumental integrity or reliability has been established either through proof that the testing device's accuracy has been verified through an independent test for accuracy or through proof that the testing device is the type recognized and normally used to verify accuracy in stopwatches.

In the present case, there is no evidence on either of the bases which we have mentioned for verified accuracy in a stopwatch.

Wilson testified that his Q.T. 10 Quartz Tester had never, to his knowledge, been tested for accuracy. Also, exactly what is a Q.T. 10 Quartz Tester? There is no evidence explaining the nature, function, or operation of a Q.T. 10 Quartz Tester. Further, Wilson testified that he did not know whether other jewelers used the Q.T. 10 Quartz Tester to verify the accuracy of stopwatches. Consequently, in view of the record presented to us, there is no "reasonable proof" of accuracy in the stopwatch used to clock Chambers' car. Evidence that Chambers' car took 51 seconds to travel the predetermined distance on Interstate 80 and was, consequently, traveling at 70 miles per hour was improperly received by the trial court. Evidence based on Stivers' stopwatch was used to prove the charge against Chambers and, therefore, constitutes reversible error. For that reason, we reverse the judgment of the district court, which affirmed the county court's decision, and remand this matter to the district court with the direction that the district court order a new trial for Chambers in the county court.

The county court's reversible error in admitting evidence of speed calculated through information from Stivers' stopwatch is properly characterized as "trial error," which does not bar retrial of Chambers after this reversal of his conviction. See, *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (retrial after reversal of a defendant's conviction, when the reversal resulted from "trial error," that is, "a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct," 437 U.S. at 15); *Lockhart v. Nelson*, ____ U.S. ____, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988) (double jeopardy clause of the fifth amendment to the U.S. Constitution does not bar retrial of a defendant if all the evidence, whether erroneously admitted or not, supports the action of the trial court or jury). See, also, *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989).

REVERSED AND REMANDED FOR A NEW TRIAL.

WHITE, J., concurring in part, and in part dissenting.

The majority cites *Burks* and *Lockhart* for the proposition that mere trial error does not bar retrial if all the evidence, whether erroneously admitted or not, supports the action of the

trial court or jury. Both cases are based upon the 5th and 14th amendments to the U.S. Constitution and thus comprise federal constitutional law.

I believe the better approach would be to follow this court's decision in *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), where we considered whether the remaining evidence was sufficient, absent the procedural or "trial error." Although in *Palmer* we did not explicitly base our ruling on Neb. Const. art. I, § 12, today's decision overrules *Palmer*.

I would reverse and dismiss.