STATE OF NEBRASKA, APPELLEE, V. ONE 1987 TOYOTA PICKUP,
APPELLEE, DENNIS R. JURGENS, APPELLANT.
STATE OF NEBRASKA, APPELLEE, V. DENNIS R. JURGENS,
APPELLANT.
447 N.W.2d 243

Filed October 27, 1989.    Nos. 88-979, 88-980.

Kirk E. Naylor, Jr., for appellant.

Robert M. Spire, Attorney General, and Kenneth W. Payne
for appellee State.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN,
GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

After a bench trial on September 19, 1988, appellant, Dennis
R. Jurgens, was found guilty of unlawful manufacture and
distribution of a controlled substance and possession of
marijuana weighing more than 1 pound (case No. 88-980).
Subsequently, Jurgens' 1987 Toyota pickup was condemned in
a forfeiture action brought by the State pursuant to Neb. Rev.

Stat. § 28-431 (Reissue 1985) (case No. 88-979). Jurgens appeals from both determinations; the appeals have been consolidated in this court.

For the reasons set forth below, both criminal convictions are affirmed. The forfeiture order is reversed and remanded for a new trial.

On October 23, 1987, the Nebraska State Patrol conducted a vehicle check stop selective at the junction of Highways 4 and 99 in Pawnee County, Nebraska. This check stop selective was conducted by four troopers and was to last from 10 a.m. to noon. A "selective" is a concentration of officers in a certain area for a particular purpose. The purpose of this selective was to check drivers for licensing and vehicles for registration and equipment violations. All vehicles were required to stop, whereupon the license, registration, and vehicle were inspected.

That morning, Jurgens was a passenger in a 1987 Toyota pickup driven by Michael Harms. Jurgens was the registered owner of the pickup. At approximately 11:15 a.m., the vehicle stopped at the check stop, where it was inspected by Troopers Gill and Chrans. Upon approaching the passenger compartment of the vehicle, Trooper Gill detected a strong marijuana odor and noticed a "marijuana substance" on the seat. During the course of their inspection of the pickup's exterior safety equipment, Troopers Gill and Chrans observed, through windows on the vehicle's camper shell, several filled canvas bags. A marijuana leaf was seen on top of one of the bags.

Consequently, Jurgens and Harms were arrested and taken to the Pawnee County jail, and the pickup was impounded and stored at a local auto body shop. That afternoon, Troopers Gill and Chrans obtained a search warrant for the pickup based upon their observations of the pickup earlier that day. A search of the vehicle uncovered large quantities of marijuana and various instruments used in cultivating marijuana.

That same day, Nebraska State Patrol Investigator Dishong obtained a search warrant for Jurgens' farm, located near Table Rock, Nebraska. Investigator Dishong had been investigating marijuana cultivation on the farm since July 1987. On several occasions he made surreptitious inspections of the premises,

finding marijuana in various stages of cultivation. The affidavit used to obtain this search warrant detailed Investigator Dishong's extensive investigations and observations of marijuana cultivation on the Jurgens farm. It also contained a one-paragraph reference to the results of the vehicle search conducted earlier that day. A search warrant was issued, and a subsequent search of the farm uncovered large quantities of marijuana and equipment used to produce marijuana.

On January 13, 1988, informations were filed against both Jurgens and Harms. On April 11, Jurgens filed a motion to suppress all evidence discovered as a result of the seizure of the pickup. On April 20, a hearing on this motion was held. Considerable testimony was elicited concerning the State Patrol's method of establishing and conducting the check stop selective. The motion to suppress was later overruled.

On September 19, both Jurgens and Harms were tried at a bench trial. The court admitted, over both defendants' continuing objection, all evidence obtained as a result of the seizure of the pickup at the check stop, including evidence obtained as a result of the search of Jurgens' farm. Jurgens was found guilty of unlawful manufacture and distribution of a controlled substance and possession of marijuana weighing more than 1 pound. He was subsequently sentenced, respectively, to terms of imprisonment of not less than 3 nor more than 10 years and not less than 1 nor more than 3 years, these sentences to run concurrently.

On October 30, 1987, the State initiated forfeiture proceedings against the pickup pursuant to § 28-431. In his answer, Jurgens contended that the vehicle was seized in violation of the fourth amendment to the U.S. Constitution. This issue was treated as a motion to suppress related to the unconstitutional seizure of the vehicle and was considered in the motion to suppress hearing conducted in the criminal case on April 20. The motion was overruled. By stipulation of both parties, evidence adduced at the suppression hearing and at the criminal trial was considered as the sole evidence in the forfeiture determination. On November 14, 1988, the trial court ordered Jurgens' pickup forfeited.

Jurgens appeals from both of these decisions. His sole assignment of error is that the trial court erred in overruling his motions to suppress.

This court has stated that in determining the correctness of a ruling on a motion to suppress, the Supreme Court will uphold a trial court's findings of fact unless those findings are clearly wrong. *State v. Marcotte, ante* p. 533, 446 N.W.2d 228 (1989). Our review of the record in this case does not disclose whether the trial court made factual findings. In any event, it is not necessary for this court to examine those findings, if any, because it is evident that the trial court erroneously applied the law in overruling the motions to suppress.

Initially, we note that standing is not an issue in this appeal. The State has conceded that Jurgens has standing to challenge the search and seizure of his vehicle.

In *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986), the defendant was convicted of driving while under the influence of alcohol after he was arrested at a vehicle check stop. This check stop was established and conducted by several patrolmen and a sergeant from the Omaha Police Division. These officers in the field were free to determine when, where, and how to establish and operate the check stop and were not acting under any standards, procedures, or guidelines promulgated by the police department or other law enforcement agency. This court held, in the majority opinion, that the check stop was constitutionally infirm because "a driver's reasonable expectation of privacy was rendered subject to arbitrary invasion solely at the unfettered discretion of officers in the field." *Crom, supra* at 277, 383 N.W.2d at 463. Thus, the defendant in *Crom* was unreasonably seized in violation of the fourth amendment to the U.S. Constitution.

On the facts of this case, it is clear that the check stop was established at the unfettered discretion of officers in the field. Originally, the selective's enforcement list promulgated by the Beatrice office of the State Patrol indicated a "roving Patrol" selective for October 24, 1987. This list was promulgated by Trooper Morris and approved by Lieutenant Winkler on September 23, 1987. At some point after September 23, but before October 23, Sergeant Nedley changed the date of the selective from October 24 to October 23 to allow him to

participate in the selective. Sergeant Nedley is the immediate supervisor to Troopers Gill and Stake and was one of four troopers involved in conducting the check stop selective. The new selective date was never resubmitted to anyone in the State Patrol command structure for reapproval. The State Patrol command structure was never aware that a selective of any type would be conducted on October 23.

Sergeant Nedley testified that the new selective, which was to be conducted on October 23, was to be a roving patrol selective. However, the testimony at the suppression hearing shows that Trooper Stake, on the morning of October 23, made the decision to change the selective from a roving patrol selective to a check stop selective. Trooper Stake was present and involved with conducting the check stop and was not in a supervisory capacity. Sergeant Nedley testified that when he arrived at work on the morning of the 23d, he expected to engage in a roving patrol selective. Shortly after arriving at work, he learned that Trooper Stake had decided to change the roving patrol selective to a check stop selective. Sergeant Nedley testified that he had no prior knowledge of the change, but that he did not object to the change.

Moreover, the evidence clearly establishes that Trooper Stake also made the decision as to when and where the check stop would be conducted. None of Trooper Stake's supervisors made this decision. Lieutenant Reitz, who on October 23 was administrative lieutenant for the headquarters troop traffic division in Lincoln, testified that he did not choose the location. Trooper Balthazor, who on October 23 was on temporary assignment as duty sergeant in the Lincoln office, testified that Trooper Stake was solely responsible for choosing the time and location of the check stop. On cross-examination the following colloquy took place between Trooper Balthazor and Jurgens' attorney:

Q Now, the — the General Operations Order also proceeds to indicate that the site of the vehicle check stop will be chosen by the supervisor at the time he decides to order such vehicle check stop. I take it you did not choose this location.

A It was chosen — It was called in by Trooper Stake and

he asked for approval for this location and it was approved at that time —

Q Okay.

A — for this location.

Q You didn't check the locat- — You didn't choose the location, he did.

A Yes.

Q And he is one of the officers who was involved in the vehicle check stop, or was scheduled to be. Is that right?

A Yes, he is.

Q Did you know anything before receiving this call from Trooper Stake that Trooper Stake and these other officers intended to conduct a — a vehicle check at the intersections of Highways 99 and 4 on this date?

A No, I did not.

Q Okay. Let me make sure I understand, and I think this will just summarize it. Apparently you received a telephone call from Stake around 7:15 in the morning. Is that correct?

A Yes, sir.

Q On the 23rd. And what Stake said to you was, in essence, we want to conduct a vehicle check; we want to do it at the intersections of Junctions 99 and 4; we want to do it between 1000 hours and 1200 hours on that date; and here are the officers that are gonna be involved by number. Is that correct?

A Yes.

Q Did he give you any other information?

A No, sir.

In addition, at no time was affirmative approval given the troopers in the field to establish and conduct the check stop. At 7:15 a.m. on October 23, Trooper Stake contacted the State Patrol office in Lincoln and left a message that a check stop selective would be conducted that morning. It was the understanding that if the troopers in the field did not receive communication to the contrary, approval was to be assumed. Trooper Stake testified that he never received any sort of affirmative approval from the Lincoln office regarding the October 23 check stop selective. The record indicates that no

trooper involved in the check stop ever received affirmative approval from anyone in the State Patrol command structure.

Based on this evidence, it is clear that the troopers in the field acted with unchecked discretion when they established and conducted the check stop selective. The date, time, location, and type of selective were chosen by certain troopers in the field who conducted the check stop selective, without the State Patrol high command's being involved. Moreover, once the specifics of the check stop were determined by the troopers, no affirmative approval authorizing the check stop selective was ever given by supervisory personnel within State Patrol headquarters. Because of these facts, Jurgens' reasonable expectation of privacy "was rendered subject to arbitrary invasion solely at the unfettered discretion of officers in the field." *State v. Crom*, 222 Neb. 273, 277, 383 N.W.2d 461, 463 (1986). We hold that Jurgens was unreasonably seized in violation of the fourth amendment to the U.S. Constitution. Thus, the trial court erred in overruling Jurgens' motion to suppress evidence seized pursuant to the check stop selective.

We note further that several years prior to 1987, the Nebraska State Patrol promulgated the general operations manual for vehicle check stops. The policy of the State Patrol, as indicated by this manual, is that "vehicle check stops will be handled with the least intrusion possible and without an unconstrained exercise of discretion." In regard to procedure, the manual provides in pertinent part:

> 2. The initial decision to conduct a vehicle check stop must be made by a neutral source, such as a supervisor who is not involved in conducting the operation in the field.
>
> a. Such decision will be communicated to the officers in the field who will conduct the stops at least 2 hours in advance.
>
> . . . .
>
> 4. The site of the vehicle check stop will be chosen by the supervisor at the time he decides to order such vehicle check stop.

Presumably, this manual was formulated to guide the State Patrol in the wake of *Delaware v. Prouse*, 440 U.S. 648, 99 S.

Ct. 1391, 59 L. Ed. 2d 660 (1979), and its progeny. It appears the manual would meet the constitutional requirement of *State v. Crom, supra.* However, merely having such rules in effect, without adhering to these rules, is not enough. When the State Patrol disregards its own rules, the troopers in the field are free to act with unconstrained discretion.

We also hold that the trial court erred in overruling the motion to suppress Jurgens' Toyota pickup as evidence in the forfeiture action. We have determined that Jurgens was unreasonably seized in violation of the fourth amendment to the U.S. Constitution. Evidence which is obtained in violation of the fourth amendment may not be relied on to sustain a forfeiture. *Boyd v. United States,* 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1885). The U.S. Supreme Court has held that the exclusionary rule applies to forfeiture actions. *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965). Because Jurgens was seized in violation of his fourth amendment rights, the trial judge erred in failing to suppress the Toyota pickup as evidence in the forfeiture determination.

Jurgens also contends that the trial court erred in admitting evidence obtained from a search of Jurgens' real property pursuant to a search warrant. He argues the evidence is tainted and therefore inadmissible because the affidavit upon which the search warrant was obtained included information regarding the marijuana found in the pickup. He urges that the evidence from the search of the real property was not derived from a source independent of the initial illegal search and seizure.

Jurgens' contentions are without merit. This court has held that where an affidavit used for the purpose of obtaining a search warrant includes illegally obtained facts as well as facts derived from independent and lawful sources, a valid search warrant may issue if the lawfully obtained facts, considered by themselves, establish probable cause to issue the warrant. *State v. Guilbeault,* 214 Neb. 904, 336 N.W.2d 593 (1983); *State v. Welsh,* 214 Neb. 60, 332 N.W.2d 685 (1983). If the lawfully obtained facts establish probable cause to issue the warrant, then there is no fourth amendment violation.

In the present case, an examination of the affidavit discloses that even if the reference to the search of Jurgens' vehicle is disregarded, there were more than ample independent facts contained in the affidavit which would have justified the trial court in issuing a search warrant. Investigator Dishong submitted an affidavit which detailed observations of marijuana cultivation made during an extensive investigation of Jurgens' real property. This investigation was conducted in its entirety before the October 23 check stop selective. The affidavit contained a one-paragraph reference to the marijuana discovered in the search of the vehicle. Clearly, the lawfully obtained facts contained in the affidavit would have provided sufficient probable cause upon which to issue a search warrant. The trial court properly admitted evidence obtained as a result of the search of Jurgens' real property.

We hold that the State Patrol, in conducting the October 23 check stop selective, unreasonably seized Jurgens in violation of the fourth amendment to the U.S. Constitution. Thus, the trial court erred in overruling Jurgens' motions to suppress evidence obtained as a result of the stop. However, with respect to the criminal convictions, this error is harmless. This court has stated that error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt. *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988); *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988). The search of Jurgens' real property, pursuant to the valid search warrant, uncovered 120 pounds of marijuana, along with elaborate equipment used to manufacture and distribute marijuana. This admissible evidence provides an ample basis upon which Jurgens could have been convicted of unlawful manufacture and distribution of a controlled substance and possession of marijuana weighing more than 1 pound. We are convinced the trial court's error was harmless beyond a reasonable doubt. Therefore, both criminal convictions are affirmed.

However, the trial court committed reversible error in overruling the motion to suppress Jurgens' pickup as evidence in the forfeiture action. To determine if double jeopardy

principles apply, we must inquire whether the forfeiture statute is criminal and punitive or civil and remedial. The U.S. Supreme Court, in *United States v. Ward*, 448 U.S. 242, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980), has stated that this inquiry proceeds on two levels. First, a court determines whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or another. Second, where Congress has indicated an intention to establish a civil penalty, a court inquires further whether the statutory scheme was so punitive, either in purpose or effect, as to negate that intention.

We conclude that § 28-431 is criminal in character. Therefore, double jeopardy principles apply. Recognizing this, however, the trial court's error in admitting evidence obtained in violation of Jurgens' constitutional rights is properly characterized as trial error, which does not bar retrial of the forfeiture determination after this reversal. See *State v. Chambers, ante* p. 235, 444 N.W.2d 667 (1989). For this reason, the forfeiture order is reversed and the cause remanded for a new trial.

JUDGMENT IN NO. 88-979 REVERSED, AND CAUSE REMANDED FOR A NEW TRIAL. JUDGMENT IN NO. 88-980 AFFIRMED.